UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUDY HOWE,

          Plaintiff,

                                    Case No.:  02-CV-70439-DT

vs.

                                      HON. DENISE PAGE HOOD
                                      MAG. JUDGE WALLACE CAPEL, JR.

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant,

_____/

## REPORT AND RECOMMENDATION

### I.      RECOMMENDATION

It is recommended that the Court grant Plaintiff's Motion for Summary Judgment in part, deny Defendant's Motion for Summary Judgment, and remand this case for proceedings consistent with this Report.

### II.    REPORT

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB].  Plaintiff signed her application for DIB on March 21, 2000, alleging that she has been disabled and unable to work since August 6, 1999,[1] due to "[f]ibromyalgia, CFS, degenerative disc in neck and small [h]erniated disc in low back T12 -L1." (TR 40-42, 52).  Benefits were denied initially on May 26, 2000.  (TR 28-32).  A de novo

_____

[1]Plaintiff's Adult Disability Report indicates that she became unable to work on March 1, 1997.  (TR 52).

hearing was held on August 8, 2001, before Administrative Law Judge [ALJ] William J. Musseman. (TR 343-63). In a decision dated October 5, 2001, ALJ Musseman found that Plaintiff could perform sedentary work. (TR 170-77). Accordingly, Plaintiff was found not disabled. Plaintiff appealed the decision. On July 9, 2002, the Appeals Council ordered the case to be remanded pursuant to a stipulation and order by both parties. (TR 190-93).

A second de novo hearing was held on January 23, 2004, before ALJ Douglas N. Jones. (TR 364-92). In a decision dated June 14, 2004, ALJ Jones found that Plaintiff could perform a significant range of sedentary work. (TR 10-19). Accordingly, Plaintiff was found not disabled. The case was reinstated for judicial review by stipulation by both parties and subsequent court order.[2] Jurisdiction is proper pursuant to 42 U.S.C. § 405(g).

A.     **PLAINTIFF'S TESTIMONY**

1.     **August 8, 2001**

Plaintiff stated that she was born on August 25, 1956, and forty-four years of age at the time of the first hearing. (TR 348). Plaintiff testified that she lived with her husband and twenty-year-old daughter. (TR 347). She stated that she has a driver's license and drives herself, but does not drive at night often and does not drive long distances. Id. She explained that her husband drives most of the time. Id. She stated that if she drives long distances, she has pain in her back and is uncomfortable sitting in one place. Id. She stated that she has problems whether she is the driver or a passenger. Id.

Plaintiff reported that she has a disability pension from General Motors [GM] for $1,693 a month as well as worker's compensation in the amount of $357.00 a week. (TR 347-48). However,

---

[2]See [Docket Nos. 8 and 10].

2

she indicated that the worker's compensation amount might change. (TR 348). Plaintiff stated that she graduated from school but did not pursue further education. Id.

She testified that she last worked August 6, 1999, and had not returned to any employment since that date. Id. Plaintiff indicated that she had to stop working due to fatigue and inability to work even within restrictions. (TR 348-49). She stated that her condition was getting worse and increasing in intensity before she stopped working; and she was feeling fatigued for at least one year. (TR 349). She stated that she was sore all over her body. Id. She explained that she feels like she has "been run over by a truck" when she gets up in the morning and has to sit for about twenty minutes before she can even function. Id. She stated that she feels like she has not had any sleep. Id.

Plaintiff stated that since she has been off work, she has taken medication, Desyrel, which helps her attain "deep sleep." (TR 350). However, she indicated that she still does not feel rested during the day and takes naps during the day up to three or four times a week for an hour or two at a time. (TR 350-51). She stated that she also rests and takes frequent breaks during the day to pace herself. (TR 351-52).

Plaintiff testified that she has been in a couple of car accidents, beginning in 1997, and a back injury in 1997. (TR 351). She stated that she has lost over twenty pounds since she was in the car accident in 1997. (TR 352). She stated that most of her problems began at that time and she still has difficulty with her back. (TR 351). She indicated that her doctors said that surgery was "not necessary at this time," but possible in the future if the back problems continue. Id.

Primarily, Plaintiff's treatment has been for fibromyalgia and chronic fatigue syndrome. Id. She also reported that she has had irritable bowel syndrome for two years prior to the hearing. (TR

352).  She testified that she eats all the time but continues to lose weight.  Id.  She stated that she weighs one hundred and five pounds and is five foot, six inches tall.  (TR 352-53).  She stated that this is her lowest weight.  (TR 353).  She stated that while she was working she weighed one hundred and twenty-seven pounds.  Id.

Plaintiff described a typical day:

> when I get up I pace myself, I clean up a little bit, and [i]f I have anything to do around the house, I will do a little bit at a time, like maybe if I have a few dishes, I'll do a few dishes.  And then I have to sit down. . . . if I wanted to pick anything up or do anything - - I get wore out really easy, so I can only do a few things at a time, and then I sit down.  I might turn the TV on and watch TV for half hour or hour until I feel that I can do something else. . . . if I was like doing laundry, trying to do laundry, I would just take clothes and sit down and try to fold them as, you know - - I might rest for an hour and then get up and do something for 10 or 15 minutes.

(TR 353-54).  Plaintiff indicated that her laundry room is located on the main floor of her home and although her house has a basement, she does not "go down there."  (TR 354).  She stated that although she has an upstairs as well, she rarely goes up there.  Id.

Plaintiff indicated that she will occasionally go to the grocery store to pick up things, but her husband frequently does the grocery shopping.  (TR 354-55).  She stated that they eat out a lot and when they eat at home, her husband does most of the cooking and she will only do so occasionally.  (TR 355).  She stated that her husband works in real estate and is at home often.  Id.  She stated that her husband removes the snow and does the yard work.  Id.  Plaintiff reported that she used to be quite active in volleyball and other sports in both the summer and winter, but can no longer participate in same.  Id.

She stated that she can stand in one location about ten minutes before her back starts to bother her and she has to sit down.  (TR 356).  She stated that she can only walk about ten or fifteen minutes and she has to shift constantly when she sits due to her back as well.  Id.  She testified that

4

she could sit for about an hour if she was able to shift around in a chair.  Id.  Plaintiff reported that she does not do any heavy lifting and cannot lift a gallon of milk.  (TR 357).  She stated that if she does too much, she is "sore for like [sic] up to a week recovering," from same.  Id.

Plaintiff reported that she takes Zyrtec for allergies, Vicodin for pain, as well as Premarin and estrogen.  Id.  She stated that she takes the Vicodin "[a]s needed," and tries "to stay away from it."  Id.  She indicated that she only takes it when she overdoes it and is in pain for four or five days as indicated earlier.  Id.  Overall, she stated that she takes the Vicodin three or four days a month. (TR 358).  She explained that on these days she takes several doses.  Id.  She stated that it helps and she "get[s] relief and tired on it," and it "knocks [her] out."  Id.  She added that she also takes non-prescription Tylenol frequently for headaches.  Id.  She reported that it also helps with her body aches, but not as much as the Vicodin.  (TR 359).

Plaintiff reported that she has also had months of physical therapy, but it did not help.  Id. She stated that Dr. Thakur recommended that she begin to use a treadmill slowly for her fibromyalgia, but she indicated that she cannot do same due to her fatigue.  Id.

### 2.      January 23, 2004

Plaintiff testified that she lives in Linden, Michigan, in a house that she and her husband recently built.  (TR 369).  She stated that her twenty-three year-old daughter occasionally lives at home while attending Baker College.  (TR 369-70).  She reported that her husband works for Century 21.  (TR 370).

She testified that she was born August 25, 1956, and is five foot, five inches tall.  Id.  She stated that she weighs about one hundred and ten pounds and is right-handed.  Id.  Plaintiff testified that she was involved in a motor vehicle accident in 1997.  Id.  She reported that she last worked in

August 1999. (TR 371). She stated that she stopped working because she "was missing more work" than not, "ached all over," was fatigued, and simply could not "function." Id.

Plaintiff stated that she is not currently working and receives a total and permanent disability pension in the amount of $1,826 a month. (TR 371-72). She stated that she does not receive any compensation for her motor vehicle accident nor any worker's compensation benefits. (TR 372). She stated that she received worker's compensation in July 2001 until June 2003, but the case is pending again. Id. She stated that she received roughly $360 a week before the benefits stopped. She stated that she received health insurance benefits along with her pension. Id. She stated that she has not participated in any vocational rehabilitation services. Id.

She reported that she has a driver's license and stated that she drives once or twice a week at the most to the supermarket, but her husband does most of the driving and she usually stays at home. (TR 372-73). She stated that she has not been on any long trips or vacations for the last two years. (TR 373). She stated that the farthest she has been is to Detroit. Id.

Plaintiff testified that her primary care physician is Dr. Dennis Lloyd, and Dr. Thakur treats her fibromyalgia. Id. She stated that she sees Dr. Thakur every three to four months and she monitors same, changes medications if necessary, sets up her diet, and other different things. Id. Dr. Thakur prescribes her Desyrel and Ambien and she also reported taking Vicodin for her pain from Dr. Lloyd. (TR 373-74). The ALJ inquired about why the two different doctors prescribe different medications. (TR 374). Plaintiff testified that Dr. Thakur has a list of all her medications and is a specialist in fibromyalgia. Id. She stated that she saw Dr. Awerbach for an EMG and other testing twice, but stopped seeing him because her insurance did not cover same. Id. She stated that

she does not remember why she saw Dr. Khandeo and she is not seeing a psychologist or psychiatrist. (TR 375).

Plaintiff stated that since August 1999 her condition has worsened. <u>Id.</u> She stated that

[i]t just seems that every day it just seems like I get a little worse. I can't remember things. I ache all over. It's like I sleep a lot. Even if I sleep, I might sleep 12 hours a night, and wake up like I haven't had any rest. It's a terrible feeling. I hurt. I ache all over. I don't know. I just, my quality of life I would say has gotten much worse.

<u>Id.</u> She stated that she has headaches all the time and recently was prescribed Imitrex for migraines in 2003. (TR 375-76). In terms of side-effects from her medications, Plaintiff reported feeling "tired all the time." (TR 376). She stated that she is not involved in any clubs or organizations, but does go to church. <u>Id.</u> She stated that she tries to go to church every week, but sometimes she does not feel well enough to do same. <u>Id.</u> She indicated that she is "pretty active" in her church, and every other week she sings with the "praise team." <u>Id.</u> She reported that she used to go to hockey games, but has only been three or four times in the last two years. <u>Id.</u> She explained that she cannot go to the games because she cannot sit that long or get comfortable. (TR 377). She stated that she would bring a blanket to sit on. <u>Id.</u>

She stated that she is able to grocery shop for a few things, but if she has to get a lot of groceries her husband goes with her, and he also does all the yard work. <u>Id.</u> She stated that when she feels able, she goes out and works with the flowers, but not for long periods of time and she paces herself. <u>Id.</u> She explained that she "might go out and plant a few flowers, like annuals or something, or . . . weed," for twenty to thirty minutes and then go in the house and sit or rest. (TR 377-78). She stated that her husband vacuums, but she can stand up and do a few dishes if she paces herself. (TR 378). She stated that she can sit at the counter to finish the dishes. <u>Id.</u> She stated that she also sits to fold the laundry, which her husband puts in the washer and dryer. <u>Id.</u>

7

She stated that she can sit in church for an hour, but she has to "shift from side to side, because it feels like [her] tailbone just starts, it's stabbing, like a throbbing." Id. She stated that she can stand for about twenty to twenty-five minutes in the same spot before she has to move.  (TR 378-79).  She stated that she leans on her cart when she does go grocery shopping because she cannot stand too long and it also helps to take the pressure off her back.  (TR 379).  She stated that she could lift a five pound bag of potatoes and put it in her cart, but that she could not carry same. Id.  She added that she only buys half gallons of milk because she has trouble lifting and controlling the larger gallon bottles.  Id.

Plaintiff stated that although she has stairs in her house to her basement, she rarely uses them and has to hold onto the rail when she does.  (TR 379-80).  She explained that her laundry room is on the main floor of her home.  (TR 380).  Plaintiff stated that she does not sleep well at night and has to take both Desyrel and Ambien to help her sleep and even when she does she is still "restless." Id.  She stated that she can never get comfortable and wakes up due to her pain.  Id.  She reported that she takes "[a] lot" of naps during the day.  Id.  She testified that she naps two to three times daily and although the naps vary each day, one can last up to two or three hours.  Id.

Plaintiff testified that she lays down on the couch and elevates her feet, which "kind of alleviates the pain."  Id.  She stated that she does same two or three times a day.  Id.  She explained that she usually falls asleep in this position; but if she does not, then she gets up after she starts to feel a little better, which is about thirty minutes later.  (TR 381).

She stated that she has two Yorkshire terriers and each is about four pounds.  Id.  She stated that she cannot bend at all and cannot squat for any length of time.  Id.  She explained that she can

8

no longer do her toenails because she "get[s] a stabbing, burning [sic] in [her] back." Id.  Plaintiff reported that she has problems grasping; and she does not think she has the muscles to push or pull. Id.  She explained that she can open a refrigerator, but she cannot push a vacuum.  (TR 382).  She stated that she has difficulty reaching overhead; if she does so her hands "usually go numb."  Id.

She stated that she cannot open jars, open a bag of potato chips, button, or fasten a necklace because she cannot grasp and has loss of strength.  Id.  She stated that her hands give out on her; however, she has not "noticed a lot of dropping."  Id.  She stated that she can only write for about fifteen or twenty minutes at a time.  (TR 382-83).  She explained that she tried to do Christmas cards and had to stop for the same period of time and could not return to finish them until the following day.  (TR 382-83).

Plaintiff testified that she can cook a meal, but she can no longer bake like she used to because of her hands and standing limitations.  (TR 383).  Plaintiff stated that she can take care of her own personal needs, but doing that in order to get ready to go somewhere "takes everything out of [her]."  Id.  She explained that "four to five times a day or [sic] out of the week, [she does] not even get dressed."  Id.  She stated that will not change clothes on those days from her pajamas.  (TR 383-84).

Plaintiff described a typical day:

I get up, I'm usually very, very slow.  It might take me a good hour or two to even get functioning, where I feel like I can do anything.  I will get up.  I'll go out and I sit at my counter.  And I might just look at the mail or whatever is, you know, sitting there, a book, whatever.  And I'll have a cup of coffee or some toast or something.  But that's usually like at noon when I get up and it'll take me an hour before I can even be mobile.  So around 2:00 maybe when I'm beginning to move at all, I'll maybe do the dishes, pace myself with that.  I don't ever do anything that's strenuous.  I do that.  Maybe I'll sit down and watch TV with my dogs or I, of course, feed my dogs.  Take care of them.  But I pretty much just monitor, I don't know what the word is, pace myself, I don't -- I really don't do anything too much.

9

. . . My husband comes home, he, a lot of times, would just bring food home.  Pick up something and we eat dinner.  And we'll sit in the living room and maybe watch a program together or something.

(TR 384-85).

### B.   MEDICAL EVIDENCE

Examinations of the parties' cross-motions for summary judgment reveal that an additional recitation of the Plaintiff's medical evidence would be repetitive.  The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[3]

### C.   VOCATIONAL EXPERT'S TESTIMONY[4]

Timothy Shaner, a vocational expert, testified at the hearing.  (TR 385-88).  The VE stated that his testimony would be consistent with the Dictionary of Occupational Titles [DOT], unless otherwise stated.  (TR 385-86).  The VE categorized Plaintiff's past work as medium and unskilled. (TR 386).  The ALJ asked the VE to assume a claimant with Plaintiff's age, education, and work experience and to further assume that such a claimant

is able to perform only sedentary work that provides an option to sit or stand at will. And involves only occasional bending at the waist or at the knees.  And occasional kneeling, but no crawling, no climbing stairs, and no climbing ladders, and no forceful or sustained gripping and grasping with either hand, and no constant, repetitive wrist movement.  And only occasional overhead reaching with either arm.

(TR 386-87).

The VE testified that under such a hypothetical the claimant could not perform her past relevant work.  (TR 387).  The ALJ asked whether there was other unskilled work that such a

_____

[3]See Subpart E, infra.

[4]Plaintiff does not challenge the vocational expert's [VE's], testimony from the first hearing; therefore, only the pertinent testimony from the second hearing on January 23, 2004, will be recited here.

claimant would be capable of performing.  Id.  The VE testified to the following positions, including but not limited to:  visual inspector, 1,800 positions; reception clerk, 6,500 positions; information clerk, 1,800 positions; and surveillance system monitor, 1,600 positions.  Id.  The VE stated that these were full-time positions.  Id.

The ALJ asked whether a need to take an hour break to complete an eight hour work day, not during lunch or coffee times, would preclude the aforementioned positions.  Id.  The VE testified that it would preclude all of the positions identified and any other unskilled work.  (TR 387-88).  Plaintiff's counsel asked the VE whether "a limitation of only occasional grip, grasp, handle, finger, feel," would have an affect on the aforementioned positions.  (TR 388).  The VE testified that the additional limitation would eliminate the reception clerk and information clerk positions.  Id.  Plaintiff's counsel then asked whether the inability to maintain "sufficient concentration, persistence, or pace to perform simple, basic work eight hours a day, five days a week," due to "chronic pain or fatigue from their condition or medication of side effects [sic]."  The VE stated that this would preclude work.  Id.

### D.   **ALJ'S CONCLUSIONS**[5]

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that "[t]he medical evidence documents the presence of impairments best described as:  fibromyalgia; chronic fatigue syndrome; degenerative disc disease of the thoracic and lumbar spines; bilateral carpal tunnel syndrome; a dysthymic disorder; mild mitral valve prolapse; mild sinus bradycardia; and status post hysterectomy (1982), and bilateral oopherectomy (1991) with

---

[5]Plaintiff does not challenge the initial ALJ's October 5, 2001, decision; therefore, a summary of same will be recited here.

menopausal syndrome," which are considered severe collectively. (TR 14, 18). However, she does not have an impairment either alone or in combination, sufficiently severe to meet or medically equal the criteria of any condition in the Medical Listings in Appendix 1, Subpart P, Part 404 of the Regulations. (TR 14, 18). The ALJ found Plaintiff's allegations regarding her limitations are not totally credible. (TR 15, 18). He determined that Plaintiff had the residual functional capacity [RFC] to perform a limited range of sedentary work. (TR 16-17, 18). Therefore, the ALJ concluded that Plaintiff is not eligible for DIB. (TR 17, 19).

### E.   ANALYSIS

Plaintiff advances several claims in her Motion for Summary Judgment. Her Motion argues that the ALJ's decision is not supported by substantial record evidence because: (1) "the Commissioner erred as a matter of law in assessing [her] credibility," (2) the ALJ failed to include mental limitations within his hypothetical to the VE, and (3) the ALJ failed to consider Dr. Kendrick's finding that Plaintiff can only occasionally reach, handle, and finger.[6] In response, Defendant's Motion for Summary Judgment contends that these aspects of the ALJ's decision are supported by substantial evidence.[7] The matter is now ready for decision.

#### 1.   Standard of Review

The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g) (1997). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a

---

[6]Plaintiff's Motion for Summary Judgment and Brief filed September 24, 2005 (hereinafter "Plaintiff's Brief"), at pages 8-18.

[7]Defendant's Motion for Summary Judgment and Brief filed October 20, 2005 (hereinafter "Defendant's Brief"), at pages 10-16.

conclusion.   Richardson v. Perales, 402 U.S. 389, 401 (1971).  It is more than a scintilla of evidence, but less than a preponderance of evidence.  Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989).

This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986).  Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see also Thacker v. Comm'r of Soc. Sec., 99 Fed.Appx. 661, 665 (6th Cir. 2004) (unpublished).  Applying these standards, I will analyze each of Plaintiff's claims.

### a.      Credibility

Plaintiff alleges that the ALJ improperly assessed her credibility.[8]  In evaluating subjective complaints of disabling pain, this court looks to see whether there is objective medical evidence of an underlying medical condition, and if so then, 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  McCoy on Behalf of McCoy v. Chater,  81 F.3d 44, 47 (6th Cir. 1995) (quoting Stanley v. Sec'y of Health and Human Servs., 39 F.3d 115, 117 (6th Cir.1994) (citing Jones v. Sec'y of Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir.1991) and (quoting Duncan, 801 F.2d at 853).

---

[8]Plaintiff's Brief at pages 8-17.

In order to determine disability based on subjective complaints, we look to 20 CFR § 404.1529(c)(3) and the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

As Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." See also, Murray v. Comm'r of Soc. Sec., 2004 WL 1765530, *4 (E.D. Mich., Aug. 3, 2004) (slip copy).

The ALJ found that

[t]he claimant's allegations that her condition has worsened since she applied for disability insurance benefits and she can perform no sustained work activity because of constant migraine headaches, constant fatigue and tiredness, even after sleeping a long time, aching all over her body, and numbness in her hands when she reaches overhead, and are not fully credible. Although her documented impairments undoubtedly generate symptoms of the general type described, the claimant's assertions concerning their intensity, persistence and functionally limiting effects are not substantiated by the objective clinical findings and medical tests in the record. She has not required hospitalization, surgical intervention or other types of aggressive treatment that would be expected in the case of a truly incapacitating condition. She has received very little medical care in recent years, and benefits from her prescribed medications. The medical evidence documents no significant medication side-effects. Her allegations are also inconsistent with her ordinary activities, which sufficiently in self-care, caring for her home and two dogs, driving

14

about twice a week to perform local errands, and attendance at minor league hockey games. Her subjective complaints were also inconsistent with her appearance and demeanor at the hearing, and the availability of $1,826 a month in disability retirement benefits. and the presence of a pending workers' compensation claim, that depend upon her not returning to her past job, also provide with secondary gain for exaggerating medical symptoms and for not seeking less strenuous work.

(TR 15). Plaintiff challenges the ALJ's reference to "secondary gain for exaggerating medical symptoms and for not seeking less strenuous work."[9] In an unpublished Sixth Circuit decision, it was held that "it is within the Administrative Law Judge's jurisdiction to consider other income sources and secondary gain in determining credibility." Brown v. Comm'r of Soc. Sec., 1 Fed.Appx. 445, 452, (6th Cir. 2001) (unpublished). In any case, the ALJ considered other factors as listed above, including daily activities, treatment, and side-effects to medication pursuant to Duncan and its progeny.

Plaintiff also challenges the ALJ's finding that she attends hockey games as part of her daily activities. (TR 15). However, as Plaintiff points out, she testified that she has only gone to three or four games in the last two years.[10] Defendant argues that Plaintiff told Dr. Dickson on October 7, 2003, "that she also enjoys going to hockey games;" (TR. 318), however, Defendant fails to state that two sentences later, Dr. Dickson stated that "[s]he said she is not able to do these things anymore." Id. Nevertheless, because the ALJ relied on other activities in his analysis of her daily activities, this appears to be harmless error. (TR 15).

Plaintiff relies on Walston v. Gardner, 381 F.2d 580, 586 (6th Cir.1967), "[a] man is disabled within the meaning of the Act, if he can engage in substantial activity only by enduring great pain."[11]

---

[9]Plaintiff's Brief at page 11.

[10]Plaintiff's Brief at page 15.

[11]Plaintiff's Brief at page 16.

However, the claimant in that case "testified that he suffers intense pain with movement. This testimony was confirmed by every doctor who examined him. Appellant cannot sit for more than five minutes." Id. Although, Plaintiff suffers pain due to her fibromyalgia, she testified that she can sit for twenty or thirty minutes if she can shift around. (TR 378). Further, she testified that she can partially alleviate her pain by laying on the couch with her feet elevated. (TR 380). Thus, it does not appear that she suffered from the same level of pain as the Plaintiff in Walston.

Plaintiff also alleges that the ALJ did not discuss her need to nap.[12] However, the ALJ did state in assessing credibility that Plaintiff complained of "constant fatigue and tiredness, even after sleeping a long time." (TR 15). The ALJ also mentioned a sleep disorder and chronic fatigue in reviewing the medical records by both Dr. Thakur and Dr. Awerbuch. (TR 12-13). In fact, the ALJ found that Plaintiff's chronic fatigue was part of her collective severe impairments. (TR 14). However, he did not discuss a need to nap. Further, he concluded that she gets relief from her prescribed medications. (TR 15). Plaintiff's daily activity sheets from August 2002, June 2003, and December 2003, document her need to nap and/or rest. (TR 236-38, 246-48, 253-55).

Defendant argues that Plaintiff's testimony regarding her need to nap, (TR 380), is not corroborated by medical evidence.[13] On the contrary, Defendant argues that Plaintiff's complaints in this regard are purely subjective and that "Dr. Thakur [indicated] that the medication Desyrel, was helping Ms. Howe obtain normal rest (sometimes up to nine hours of sleep) each night."[14]

However, these notes from Dr. Thakur are dated April 10, 2001. (TR 269). On October 29, 2001, Dr. Thakur reported that her "sleep disorder persist [sic] can take a nap during the day." (TR

---

[12]Plaintiff's Brief at page 16.

[13]Defendant's Brief at pages 13-14.

[14]Defendant's Brief at page 14 (citing TR 269).

270).  On May 23, 2002, she continued to complain of fatigue and difficulty sleeping, even on the

Desyrel.  (TR 274).  In November 2002, Dr. Thakur stated that "[s]he still has sleep disorder and

sometimes she sleeps very late at night and then suffers from fatigue during the day."  (TR 298, see

also TR 300).  Further, on June 6, 2003, Dr. Thakur states, "[i]nsomnia is worse.  She mentioned that

Desyrel is not helping."  (TR 302).  This particular record is cited by the ALJ.  (TR 13).

It is unclear as to why the ALJ discounted the need to nap when he acknowledged that Dr.

Thakur reported increased insomnia and complaints of fatigue.  (TR 13, 302).  Dr. Lloyd also noted

complaints of increased fatigue in 2003.  (TR 304).  Further, later in his decision, the ALJ notes and

relies on the facts dated April 10, 2001, that Dr. Thakur reported that Plaintiff "was sleeping nine

hours at night, had less fatigue," and that "Dr. Thakur recommended *increased* exercise (Exhibit B-

2F7-8)."  (TR 16).

However, this is more than two years earlier than the ALJ's recitation of the medical records

of June 2003, regarding increased insomnia and complaints of fatigue.  Meaningful appellate review

of the ALJ's credibility finding is undermined by his reliance on outdated medical evidence

regarding same.  This is especially troubling given the VE's testimony that a need to nap as testified

by Plaintiff would preclude work.[15]

---

[15]The undersigned notes that Plaintiff argues that "[t]he ALJ discounted [her] credibility/testimony in order to deny benefits."  However, this appears to be an attack on the ALJ, and in Howard v. Sec'y of Health and Human Servs., 932 F.2d 505, 509 (6th Cir. 1991), the Sixth Circuit articulated its position on such "aspersions" well:

> This suggestion that bigotry underlay the ALJ's determination that Howard was not eligible for benefits, a claim completely unsupported in the record before this court, was not well received by this panel and will not be countenanced in the future by this court.  Counsel are advised that personal aspersions, whether they be cast at opposing counsel or members of the judiciary, have no place in argument before us unless they are strictly pertinent to a legal issue, such as the imposition of Rule 11 sanctions or claims of judicial or prosecutorial misconduct.

b.        **Mental Limitations**

Plaintiff argues that the ALJ failed to give any mental limitations within the RFC.[16]  Plaintiff points out that Dr. Dickson noted a global assessment of functioning [GAF] of 56 and that Dr. Kendrick diagnosed depression.[17]  However, "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.  Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002).  Further,  a diagnosis says nothing about the severity of an impairment, as in Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988),  the Court stated, "[t]he mere diagnosis of arthritis, of course, says nothing about the severity of the condition. Foster v. Bowen, 853 F.2d 483, 489 (6th Cir.1988) (diagnosable impairment not necessarily disabling)."

Further, although Plaintiff admitted feeling depressed in January 2000, and Dr. Sabbagh stated that she had "depression which needs to be addressed and treated appropriately," (TR 159), there is no evidence in the record showing such treatment.  Furthermore, Plaintiff denied depression six months later in July of 2000.  (TR 154-55).  Plaintiff argues that "the diagnosis of a mental impairment is not only littered throughout the medical records of evidence but it is also a diagnosis that is commonly and often seen in individuals suffering from fibromyalgia and chronic pain/fatigue syndrome," but fails to point to specific citations within the record reflecting same.[18]  "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,

[16]Plaintiff's Brief at page 17.

[17]Plaintiff's Brief at page 17 (citing TR 320, 333).

[18]Plaintiff's Brief at page 17.

are deemed waived.  It is not sufficient for a party to mention a possible argument in the most

skeletal way, leaving the court to....put flesh on its bones."  McPherson v. Kelsey, 125 F.3d 989,

995-96 (6th Cir. 1997) (citations omitted).

### c.      Dr. Kendrick

Plaintiff also argues that the ALJ failed to find limitations consistent with Dr. Kendrick's

findings that Plaintiff is only " capable of occasional reaching, handling and fingering (i.e., gross

and fine manipulation)."[19]  However, as Defendant points out Plaintiff's counsel questioned the VE

regarding the additional limitations and

> when her representative asked the ALJ to assume a person who could only use her
> hands on an occasional basis, the vocational expert replied that he would eliminate
> two of the four jobs that he had previously identified.  The vocational expert
> eliminated the receptionist work and the information clerk jobs (Tr. 388). This still
> left 3,400 jobs that Ms. Howe could perform and those jobs did not require frequent
> hand movements. This argument, even if one assumes that Ms. Howe is correct, still
> does not provide a basis for remanding this case.[20]

Defendant is correct because the remaining 3,400 positions provide a substantial number of jobs

under Hall v. Bowen, 837 F.2d 272 (6th Cir.1988) (finding that between 1,350 and 1,800 jobs in the

region was sufficient, although there is no "special number").  Therefore, the fact that the ALJ listed

the information clerk and receptionists' positions is harmless error.

### 2.      Remand Versus Benefits

The remaining issue is whether remand or an award of benefits is the appropriate remedy for

Plaintiff.  It is firmly established that under § 405(g), a court may remand for an award of benefits

"only if all essential factual issues have been resolved and the record adequately establishes a

---

[19]Plaintiff's Brief at page 17 (citing TR 338).

[20]Defendant's Brief at pages 15-16.

19

plaintiff's entitlement to benefits." <u>Faucher v. Sec. of Health & Human Servs.</u>, 17 F.3d 171, 174 (6th Cir. 1994)(citations omitted).  More specifically, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking."  <u>Id.</u> (citing <u>Mowery v. Heckler</u>, 771 F.2d 966, 973 (6th Cir. 1985)).

Unfortunately, the ALJ's adverse decision was deprived of substantial evidentiary support because he failed to evaluate all the evidence of record relating to Plaintiff's alleged need to nap. This case should be remanded to allow the ALJ to evaluate the other evidence of record regarding same.  The ALJ's assessment of Plaintiff's fatigue and need to nap may not change the credibility determination; therefore, a remand for benefits would be premature.

## III.   <u>CONCLUSION</u>

For the reasons stated, I recommend that the Court **GRANT** Plaintiff's Motion for Summary Judgment **IN PART**, **DENY** Defendant's Motion for Summary Judgment, and **REMAND** this case for proceedings consistent with this Report.

Pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof.  The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals.  <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.


s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**Dated:**  February 16, 2006

21

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on <u>February 16, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Janet Parker, Assistant United States Attorney, 101 First Street, Suite 200, Flint, Michigan 48708, Victor L. Galea, 412 S. Saginaw Street, Suite 205, Flint, Michigan 48502, and Mikel E. Lupisella, 1121 N. Michigan Avenue, Saginaw, Michigan 48602</u>.

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u> Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606  </u>.

<u>s/James P. Peltier</u>
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov

22